ITT GILFILLAN, INC. and International Telephone and Telegraph Corporation

v.

The UNITED STATES.

No. 356–68.

United States Court of Claims.

Jan. 18, 1973.

---

Gilbert A. Cuneo, Washington, D.C., attorney of record for plaintiff; N. J. Villarosa, Nutley, N. J., G. Donald Haarer, Encino, Cal., C. Stanley Dees, Buel White, and Sellers, Conner & Cuneo, Washington, D.C., of counsel.

Michael J. Rubin, Washington, D.C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This is a contract case before the court on cross motions for summary judgment pursuant to Rule 163(b). Plaintiff seeks review of a decision of the Armed Services Board of Contract Appeals (ASBCA), 68–2 BCA ¶ 7086, alleging that the Board's decision did not meet the standards set forth in part two of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964).

The question raised in this case is whether ITT Gilfillan, Inc., is entitled to be reimbursed under certain cost reimbursement contracts for corporate service charges (G & A) and corporate research fund charges (IR & D) incurred by ITT Corporation and assessed against its subsidiaries, including plaintiff. At issue are two contracts. The parties agree that the result as to the two contracts will control similar costs on fourteen other contracts. All sixteen contracts were among some 443 contracts transferred, all made with the Gilfillan Corporation, or its predecessor.

Gilfillan Brothers Inc., was a closely held corporation of excellent repute for efficiency, engaged in the design and manufacture of radar equipment. The principal stockholders were members of the Gilfillan family. In 1962 that corporation's name was changed to Gilfillan Corporation. On January 30, 1964, immediately prior to the transfer here involved the corporate name was changed to 1815 Venice Boulevard Corporation. On that same date all of the assets of 1815 Venice Boulevard Corporation were transferred to plaintiff, ITT Gilfillan (hereinafter ITT G), a wholly owned subsidiary of the well known ITT Corporation. Also on that date the Government recognized by a novation agreement with ITT G and 1815 Venice Boulevard Corporation the transfer of some 443 contracts, including the contracts here in question, to the plaintiff.

The novation agreement, which was incorporated by amendment into the transferred contracts, states in pertinent part in paragraph 16:

16. The Transferor and the Transferee hereby agree that the Government shall not be obligated to pay or reimburse them or either of them for, or otherwise give effect to, any costs, taxes or other expenses, or any increases therein, directly or indirectly arising out of, resulting from, or attributable to (i) said assignment, conveyance or transfer, or (ii) this Agreement, and that no claim for payment by or reimbursement from the Government shall be made by either of them with respect to such items, other than those which the Government, in the absence of said assignment, conveyance and transfer, or this Agreement, would have been obligated to pay or reimburse under the terms of the Contracts in effect prior to the execution of this Agreement.

The dispute as to the application of the novation agreement arose in April, 1965, when ITT G presented cost vouchers to defendant's contracting officer seeking reimbursement for the allocable portions of assessments for IR & D and G & A costs which it had paid to ITT Corporation. The contracting officer viewed the costs as being barred by paragraph 16, and disallowed them. Plaintiff appealed this decision to the Armed Services Board of Contract Appeals (the Board). In a carefully considered and well reasoned decision the Board made fact findings in great detail, discussed the applicable law in depth, and upheld the contracting officer's decision, on the basis of the novation agreement.

In its petition before this court, plaintiff contends that the decision of the Board was erroneous as to matters of law and therefore should be overturned. Neither side takes exception to the Board's numbered findings, but plaintiff rejects some of its ultimate factual conclusions. In its petition plaintiff includes two counts. The first is under the Wunderlich Act, *supra*, alleging legal error by the Board, and the second is a breach claim. In its brief in support of its motion for summary judgment plaintiff urges alternatively that it should be granted a trial *de novo* on its second claim. We hold that the issues presented in both claims are such that they can be disposed of now.

■ In its first claim for relief (count I of plaintiff's petition), plaintiff contends (1) that the novation agreement lacked consideration and was therefore a nullity, and (2) that even if the novation agreement is held to be ef-

fective it was not intended to bar recovery of the costs in question.

That the novation agreement lacked consideration and therefore is of no effect is urged on the premise that the transfer of the contracts took place by operation of law, as the result of a corporate merger. If the transfer was by operation of law, the plaintiff argues, then there was no need to enter into a novation agreement. The Government's consent to the transfer was, it says, not required. In support of this argument the plaintiff points to an administrative decision made by the IRS in response to questions concerning plaintiff's tax liability as the result of its taking over the assets of Gilfillan Corporation. The plaintiff also argues that the instant case does not present the evils intended to be dealt with in the anti-assignment statutes. See 31 U.S.C. § 203, and 41 U.S.C. § 15 (1964).

The defendant argues that what has taken place is a complete corporate reorganization, the costs of which are specifically barred by the Cost Principles which control Cost Reimbursement Contracts, 32 C.F.R. § 15.205–23 (1960, Supp.) and that the anti-assignment statutes were intended, among other things, to prohibit incurrence of extra costs to do the same job which might result from the assignment of contracts.

From the defendant's point of view, since the transfer would have been barred by statute, without the signing of the novation agreement, there was adequate consideration on the part of the Government, and the novation agreement should be given effect.

In dealing with the question of consideration it is not necessary to examine the character of the acquisition of Gilfillan Corporation by ITT Corporation, as the Board did, to determine if the transfer was a "reorganization" or not. It is clear that at the time of the acquisition the defendant believed and claimed in good faith that the transfer of the contracts in question, even by reorganization, was barred by the anti-assignment statutes unless consented to by novation. ASPR 1–1602. There is nothing in the text of the statutes or the regulation to establish that a transfer incident to a reorganization was specifically excepted. As a result of the parties signing the novation agreement the defendant refrained from asserting its position. It has been held by this court that such a compromise leading to forbearance is in itself consideration. In Penn-Ohio Steel Corp. v. United States, 354 F.2d 254, 173 Ct.Cl. 1064 (1965), the plaintiff was the lessee of a plant from the Navy. As the result of the Korean War, the Army wished to make the plant available for the use of another corporation with which it had contracted for the production of tanks. An agreement was reached between the plaintiff and the Navy whereby plaintiff's lease would be suspended during the period of the Army's use, after which the plaintiff would be allowed to re-occupy the plant. Instead, at the end of the Army's occupancy, plaintiff's lease was terminated for the convenience of the Government. Plaintiff sued in this court to recover damages allegedly resulting from the Navy's breaching of the agreement.

As one defense to the plaintiff's claim, the Navy noted that under the national emergency clause of the lease the plaintiff was obligated to surrender possession and its lease-hold interest at the request of the lessor. The Navy argued that the agreement by which the plaintiff's lease would be suspended was of no effect since the plaintiff had given up nothing of value, and therefore there was a lack of consideration.

The court noted that though plaintiff may well have had to vacate the plant anyway, the Government's purpose was to obtain the plant at the earliest possible time. This was achieved by way of the agreement which served to forestall the possibility of plaintiff's pressing claims based on its leasehold rights. In holding that the compromise agreement was supported by consideration the court quoting from 1 Williston, Con-

tracts (3rd Ed.) § 128, fn. 18, stated at page 1088, 354 F.2d 268:

\* \* \* it is settled law that a compromise "is supported by sufficient consideration when there is a bona fide claim which is \* \* \* disputed or doubtful, the real consideration to each party being not the sacrifice of the right but the settlement of the dispute." (Cites omitted.)

Likewise in the case of State of Oklahoma v. United States, 173 F.Supp. 349, 146 Ct.Cl. 185 (1959), this court held forbearance on the part of state officials in asserting legal claims for damages to be adequate consideration to support a promise by the Government to pay certain sums of money.

It is obviously unlikely that ITT Corporation would have been interested in a "merger" without acquiring an uncontested right for its subsidiary to take over the contracts. Assertion by the Government of its bona fide claim that the transfer was barred by the anti-assignment statutes would have put the whole transaction in jeopardy. Defendant's forbearance in asserting a bar against the transfer resulted from the parties entering into the novation agreement, in the form defendant had prescribed for such circumstances. Such forbearance, under the circumstances is sufficient consideration to support the compromise thereby reached.

The question remains as to whether the costs here in question are barred by the agreement. In order for the costs to be allowable it must be shown that they are costs "which the Government, in the absence of said assignment, conveyance and transfer, or this Agreement, would have been obligated to pay or reimburse under the terms of the Contracts in effect prior to the execution of this Agreement.", paragraph 16 of the novation agreement.

Plaintiff tells us that the costs are of the type which would be and, in fact have been, allowable in cost reimbursement contracts. Plaintiff tells us that there is evidence which demonstrates that the changes made as the result of the expenditures in question would have had to have been made by Gilfillan Corporation even had there not been the acquisition by ITT. The plaintiff asserts that the novation agreement must be read narrowly so as to preclude the recovery of only a limited area of costs occurring as the outcome of the transfer of contracts from one party to another. Finally, the plaintiff would have the court take notice that in negotiations between ITT Corporation and the defendant to arrive at an IR & D rate for the Corporation, the sales of newly acquired companies including plaintiff were included at the defendant's insistence. Plaintiff contends as part of its first claim that it would be inconsistent to prohibit ITT Corporation from charging these costs to ITT Gilfillan. Plaintiff's second claim is an allegation that to prohibit the costs involved would be a breach of an implied agreement as to ITT Corporation's IR & D rate, made as above described.

Defendant argues that the type of costs involved would be reimbursable in a Cost Reimbursement Contract only if they had been recognized "as ordinary and necessary for the conduct of the contractor's business or the performance of the contract", 32 C.F.R. § 15.201–3(a). Defendant alleges that the costs with which we are dealing are the costs of a corporate reorganization and as such are not "ordinary or necessary" and in fact are specifically barred by the cost principles set up to control Cost Reimbursement Contracts, 32 C.F.R. § 15 (1960, Supp.), especially § 15.205–35. Defendant goes on to assert that the plaintiff has failed in its burden of showing that without the acquisition of Gilfillan Corporation by ITT G the costs in question would have occurred. Defendant would have the novation agreement applied broadly so as to bar essentially all costs arising as the result of the transfer. As for the negotiations to reach an ITT Corporate IR & D rate, defendant admits that the sales of newly acquired corporations were included in

determining the rate. However, defendant points out that the agreement reached through the negotiations included specific language which made the recovery of costs "subject to the terms and conditions of specific contracts between the Department of Defense and the Contractor." The contracts here in question included the novation agreement which by its terms bars the costs claimed by the plaintiff. Defendant argues that the above clause of the agreement on IR & D rate for ITT Corporation counters part of plaintiff's first claim and completely disposes of plaintiff's second claim.

Before interpreting the novation agreement and deciding whether it applies to the costs in question, it is necessary to examine the precise character of these costs. The costs for which the plaintiff is requesting reimbursement arose as the result of assessments made upon ITT G by ITT Corporation. The G & A (corporate service charge) costs in question are those arising out of ITT G's share of the ITT Corporation's G & A pool which covers the expense involved in supporting the various ITT departments, such as comptroller, legal, treasurer, personnel and planning. The services of these departments have been made available to ITT G, although these personnel are not permanently assigned to the local affiliate. ITT G maintains its own permanent staff, the members of which are paid out of ITT G's own G & A charges to its customers. The ITT G–G & A charges are not at issue in this case.

The Independent Research and Development (IR & D) or Corporate Research Fund Costs are also charges which are assessed against all ITT Corporation subsidiaries by the parent Corporation. These charges cover the costs incurred in the research and development of new and improved products. IR & D rates are recovered by ITT Corporation pursuant to a rate arrived at by negotiation with the defendant.

On their face the costs are those which arose out of assessments by a parent corporation against its newly acquired affiliate. Since Gilfillan had no parent prior to the transfer and such assessments could not have occurred, the burden rests upon the plaintiff to demonstrate here that the costs in question fall outside those costs which are barred by the novation agreement. Plaintiff must show that they are costs "which the Government, in the absence of said assignment, conveyance and transfer, or this Agreement, would have been obligated to pay or reimburse under the terms of the Contracts in effect prior to the execution of this Agreement.", paragraph 16 of the novation agreement.

If it makes any difference, the Board found that Gilfillan Corporation was efficient in the hands of its former owners. It saw no reason to doubt that the contracts involved would have been performed successfully absent any reorganization, and absent any significant change in Gilfillan's management and mode of doing business.

Plaintiff's briefs attempt to show that the types of costs here in question are normally allowable under a cost reimbursement contract. If Gilfillan Corporation had incurred these costs, prior to the transfer, the plaintiff argues, it would have been reimbursed for them, and plaintiff admittedly has been so reimbursed under new contracts awarded since the novation.

In order for plaintiff to overcome the novation agreement terms, however, it must show not only that the costs are of the type that are normally reimbursable but also it must surmount the added barrier to allowability found only in the novated contracts. In attempting to do this for the G & A costs plaintiff looks to "Survey of Management Systems and Controls" made by the Inspector of Naval Material (INSMAT Report) in 1964. In plaintiff's eyes this report shows that ITT G would have had to incur the added costs here involved anyway. This report concluded that "Gilfillan was technologically well advanced and its products well designed, expertly manufactured and of high quality; however, ad-

ministrative systems and controls had not kept pace with technology." (Board Finding 3.) Several suggestions were made in the report for changes in program management and production control. It is clear then that even if there had been no corporate acquisition there would have likely been changes made in certain aspects of Gilfillan's operations. What is not clear is whether the changes actually made by plaintiff were commensurate with the suggestions made in the INSMAT Report. INSMAT did not recommend that Gilfillan be taken over by ITT or by any other corporation of its type, and if any added costs had been incurred per INSMAT advice, they need not have had the peculiar characteristics of the costs here involved.

Board Findings 4 through 9 reveal the extent of the changes made by ITT G after the acquisition of Gilfillan Corporation. The changes made included the establishment of new departments and the creation of new "key executive" positions. Numerous ITT publications on programs and procedures were supplied to ITT G and their contents implemented. ITT legal personnel advised ITT G on contracts, patents and other legal matters. A functional audit of the purchasing department of ITT G resulted in reduction of the number of buyers and clerk typists. A quality improvement program was instituted with cost reductions. Long range planning was instituted at ITT G in accordance with the ITT "Planning Guide". Plans for consolidation of the scattered plants of ITT G were drawn up with the assistance of ITT experts. Major changes were made in the area of comptroller responsibility which included plant expenditures, expense accounting, contract cost accounting, payroll, insurance, audits of operations, et cetera. In sum all changes suggested by and in accordance with ITT manuals of procedure were instituted by ITT G.

There is no dispute as to the fact that the acquired corporation benefited from the changes made. Also it may be assumed *arguendo* that in the long run the Government would enjoy a benefit from the changes. However, it does not follow from the fact that certain changes were suggested in the INSMAT Report that the Gilfillan Corporation would have endeavored to institute the sweeping changes only partially described above. It must be remembered that the Gilfillan Corporation, managerial shortcomings notwithstanding, was still the recognized leader in the field of Radar technology. It is therefore unlikely that its management would have felt it was necessary to go very far beyond the specific suggestions which were part of the INSMAT Report. The changes actually made have the look of being primarily to enable the new management to take effective control and of being operative to reduce costs only to the extent the primary purpose was first achieved. These costs were costs which arose as the result of the transfer and are thereby barred by the novation agreement. Without a more precise showing by the plaintiff of comparable costs which the Gilfillan Corporation would have had to incur to perform the contracts, had there been no acquisition by ITT, it cannot recover on this part of its first claim.

■■ The second part of plaintiff's first count is for IR & D costs. As noted above, as was the case with the G & A costs, these costs arose as the result of assessments by ITT Corporation against ITT G. Again the test as to whether these costs are reimbursable is whether the Government would have been obliged to pay them had there not been a corporate acquisition.

It was the policy of the Gilfillan Corporation to charge IR & D costs against its profits. In other words, Gilfillan did not seek reimbursement for IR & D costs. The plaintiff argues that with the change being experienced in Government contract policy from cost-type to fixed-price-type contracts, it would have been very poor business policy for Gilfillan to continue not to seek reimbursement for these costs. This may well be so, but the plaintiff fails to show that as to the

contracts in question Gilfillan would have in fact sought reimbursement. Finally, it should be noted that at the time of the acquisition of Gilfillan, ITT had no radar production program of its own. Therefore, any benefits from the IR & D program of ITT G and ITT Corporation were shared by both the parent and subsidiary. Without a showing that the markedly increased costs for IR & D would have been incurred by Gilfillan in the performance of the contracts in question, and charged to the defendant in these contracts, the plaintiff cannot recover on the second part of its first claim.

Plaintiff argues that central to the above analysis of the reimbursability of the costs in question is an objectionably broad reading of paragraph 16 of the novation agreement. Plaintiff would have the court read the phrase "any costs, taxes or other expenses, or any increases therein, directly or indirectly arising out of or resulting from, attributable to (i) said assignment, conveyance or transfer * * *" to prohibit only those costs such as transfer taxes, fees and expenses which arise out of the act of transfer, and those costs which are attributable to the transfer but not to any substantive change in operations or benefits received, i. e., cost increases due to accounting changes or evaluations unrelated to substantive or actual changes in the way of doing business. The language of the novation agreement and the case law that exists on the question of interpreting such an agreement leads us to a different conclusion.

In Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. 31 (1968), the court was presented with the problem of interpreting a novation agreement differently worded than the one at bar, but apparently intended for the same purpose. The plaintiff claimed reimbursement of increased depreciation costs which resulted from the fact that assets used in performing the contracts acquired a new value base by the price assigned them in the reorganization. The plaintiff argued that the novation agree-

ment should be interpreted to preclude only increases in the total cost of performance of the contract and the actual costs of making the transfer. The court quoted with approval from the Board's statement that "The words 'any costs' are broad. They restrain the reimbursement of particular costs on a selective basis, where it appears that the cost increase arose out of the transfer.", and we went on to say, 389 F.2d 412, 182 Ct.Cl. at p. 41:

> We do not agree with plaintiff's argument that the prohibition should be limited to the actual costs of the transfer, such as attorney fees and premiums or bonuses paid for the property over and above its value. Certainly, these items are included in the restriction and defendant would not be liable for them because they arose out of or were attributable to the assignment, but the prohibition cannot be said to be limited to them alone. It is our view that claims of the plaintiff for normal increases in the cost of labor, material, and even overhead, occurring after the transfer in the ordinary course of business, would not be prohibited by the novation agreement, because they would not have arisen out of the transfer nor have been attributable to it. Such increases in costs would have occurred without the assignment and defendant would have been liable for them.

It is true as plaintiff points out in its brief that the court was not faced with the type of costs in question in the case at bar. However, the statement of *Sundstrand* is clear that in order for increased costs to be reimbursable they must be "normal increases * * * occurring * * * in the ordinary course of business", not new and novel costs that could not have been incurred, still less reimbursed, under the prenovation way of doing things. The plaintiff has failed to show that the costs here in question were normal increases occurring in the ordinary course of business.

In LTV Aerospace Corp. v. United States, 425 F.2d 1237, 192 Ct.Cl. 191

(1970), this court was again asked to interpret a novation agreement similar to the one at bar. In that case which also involved depreciation costs, the plaintiff asserted that the term "any costs" in the agreement was ambiguous and that a proper interpretation of the agreement would allow reimbursement if it could be shown that there had been a savings in the total cost of performance. Alternatively plaintiff argued that if Government had the right to disallow selective cost increases it (plaintiff) should have the right to offset any selective cost savings. The court rejected plaintiff's interpretation as not being "one a reasonable contractor would have supposed to be correct." On the authority of *Sundstrand* the court refused plaintiff the relief sought.

The plaintiff in the case at bar, as did the plaintiffs in the above discussed cases, raises the spectre of an overly broad reading of the novation agreement precluding any increased or new cost which arises as the result of acquiring company performing the contract in a different manner or under different management techniques. The plaintiff asserts that the standard of identity of costs would be impossible to meet. Such cases will have to be decided when they arise: we do not foreclose them now. We also recognize that there may be cases where the question of what are "normal increases * * * occurring * * * in the ordinary course of business" may be difficult to ascertain. However, the case at bar is not one of those. Here we have what is on its face a corporate reorganization which made possible the incurrence of costs, in the form of monetary exactions by the new parent, which otherwise would have been impossible and which were not shown to be necessary or even beneficial, except in the long run.

Plaintiff argues that the court is faced with two reasonable interpretations of the novation agreement. One by the Board which would apply the novation agreement broadly. The other by the plaintiff which would be a more narrow interpretation not to include the prohibition of the costs in question in this case. It should be obvious from the above discussion that we do not agree that under the circumstances before us that plaintiff's interpretation is reasonable and therefore we do not consider this case appropriate for the application of the doctrine of *contra proferentem*.

We ask ourselves what the Government intended to achieve by the novation clause involved? The result looks arbitrary from a contractor's point of view, in that costs which would be routinely allowable for reimbursement under other contracts are knocked out because of the—to it—irrelevant fact of a novation, and without regard to whether in the long pull the item may benefit the Government. We must, however, assume the defendant intended nothing unfair. Conceiving, as it did, that it could invalidate the transfer of contracts with it, by refusing its consent, it asked itself what might be the consequences of granting consent. One might be an increase in allowable costs. Changing one contractor for another might of itself do this, because the facts and circumstances that generate allowable and allocable costs are not the same for any two contractors. This would be a particularly objectionable consequence of a novation. Funds for reimbursement type and other cost type contracts must all be estimated, appropriated and allotted, if necessary fiscal controls are to be maintained. The procuring agency, faced with a possible cost increase, would need time, and a knowledge of the circumstances of each contract, to decide what to do. Thus the agency would be fearful of amending all at once, as here, 443 contracts, with no opportunity to study the cost consequences of each amendment, contract by contract, allotment by allotment. The novation clause here involved would hedge against this risk, so far as concerned new costs and cost increases connected with the contract transfer and novation themselves. It might well be that a study, contract by contract, allotment by allotment, might establish that

the risk was acceptable, or non-existent. Then the disapproved item, or an equivalent, might be restored to allowability either by amendment to contracts subject to the novation (as happened here) or under new contracts (also as happened here). Such actions would in no way be inconsistent with disallowances while the novation clause remained in effect.

This construction of the purpose of the clause must be to some extent conjectural, because here, as usually happens with contract clauses, no "legislative history" is offered for our enlightenment. However, we think the clause pretty much states for itself what its purpose is. Should it be anything else, that would require demonstration.

■ It follows that the cost inspection officers of the Government, the contracting officers, and the Board, are not called upon to decide such false issues as whether a cost questioned under this cause will, if incurred, benefit the Government in the long run, whether it is reasonable, whether it is allowable under cost accounting principles, or whether if it were not incurred, other allowable costs would mount even larger. The issue before them is, solely and simply, whether the questioned cost arises directly or indirectly out of the novation and contract transfer, and whether it is one the Government would have had to pay, absent any novation. There may be required some precedential rulings as to what constitutes an indirect connection in this context, and we hope our *Sundstrand* and *LTV* rulings, and this one, may be helpful in that regard. Whatever uncertainty there may be does not justify the parties going into battle on any of the false issues indicated above.

We turn now to the negotiations between ITT Corporation and defendant in reaching a corporate IR & D rate. At the defendant's insistence the sales of newly acquired corporations, including those of ITT G were included in arriving at an IR & D rate for the parent corporation.

■ As part of its first claim for review of the Board's opinion, plaintiff points to the negotiations as evidence that the parties intended that the IR & D costs of the parent corporation be recoverable against all affiliates, including plaintiff, whose sales were included in arriving at the rate. The agreement states in pertinent part:

This document including the attached Schedule 'A' sets forth an advance agreement between the International Telephone and Telegraph Corporation, hereinafter called the Contractor, and the Department of Defense. The agreement establishes the degree in contract pricing to which independent research and development (as defined in ASPR 15–205.35) will be recognized for the years covered.

\* \* \* \* \* \*

4. Independent research costs are to be allocated on the basis of total domestic sales net of intercompany purchases and exclusive of Federal Electric Corporation sales. Independent development costs are to be allocated on the same basis except that the base for each product line shall be limited to sales within the product line.

\* \* \* \* \* \*

1. This advance agreement on independent research and development costs is *not to be considered an advance determination as to the allowability* of any specific project costs that were identified in the technical brochure submitted for evaluation or subsequently included by the Contractor as part of his independent research and development program.

\* \* \* \* \* \*

4. *Recovery* of independent research and development costs pursuant to this agreement is *subject to the terms and conditions of specific contracts between the Department of Defense and the Contractor*. Contracts negotiated under ASPR XV prior to November 1959 should be especially noted because such contracts do not

permit recovery of independent research and development type costs unless a special clause has been included. [Emphasis supplied]

By its very terms the agreement only covers allocability of costs to particular contracts, not allowability, and is subject to the "terms and conditions of specific contracts." As the body of our opinion concedes at least *arguendo*, costs in question in this case would have been allowable but for the terms of the novation agreements which are a bar to recovery in this case.

■ Plaintiff's second count, in which it is alleged that the defendant breached the above agreement by disallowing the IR & D costs at issue, is without merit. Contrary to plaintiff's assertion that there must be a trial *de novo* on this issue, in view of the identity of controlling factual issues this court is bound by factual findings of the Board, which demonstrate that the contract was not breached. Since the agreement as to IR & D costs was subject to the specific terms and conditions of the contracts in question, the Board had jurisdiction to render complete relief under the Disputes Clause of the contracts in question. The Board looked to the language of the *Recovery* Clause of the agreement, held that it applied to the contracts in question which precluded recovery in this case. As stated in *Sundstrand Turbo, supra*, 389 F.2d 423, 182 Ct.Cl. at page 62:

> * * * In such an instance, as here, where the plaintiff relies on the same facts and theories in its claim for breach of contract, which it relied on in its claims before the Board, the Board's findings of fact are insulated against judicial correction unless the specified defects mentioned in the first section of the Wunderlich Act * * *, are present. (Cites omitted.)
> * * *

The Board's findings as to IR & D costs lead to the conclusion that such costs were barred by the specific terms of the contracts in question. As such, the de-

nial by the defendant of the requested recovery of these costs was not a breach of this agreement.

Defendant filed a counterclaim in this action in which it asks for an accounting of all amounts charged by ITT Corporation to its acquired corporations doing business with the Department of Defense. Defendant also asks for judgment in the amount of the total of such sums as were recovered by any of ITT's subsidiaries. This claim goes beyond the scope of our opinion and involves issues not briefed by the parties nor dealt with in their motions. Proceedings on the counterclaim are remanded to our commissioner, under Rule 131(c).

Plaintiff's motion for summary judgment is denied, and it is not entitled to recover. Conversely, defendant's motion for summary judgment is granted with respect to plaintiff's claim. Dismissal of the petition will be withheld until determination of defendant's counterclaim.